STATE OF CONNECTICUT *v.* CHRISTINE GONDA
(AC 17400)

Lavery, Hennessy and Stoughton, Js.

Argued February 25—officially released June 22, 1999

*James Moreno*, special public defender, for the appellant (defendant).

*Richard F. Jacobson*, supervisory assistant state's attorney, with whom, on the brief, was *Jonathan Benedict*, state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Christine Gonda, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48[1] and 53a-54a.[2] On appeal, the

---

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to

defendant claims that (1) the state failed to present sufficient evidence to sustain her conviction in violation of the fifth and fourteenth amendments to the constitution of the United States and article first, § 8, of the Connecticut constitution, (2) the state improperly argued that reasonable doubt is not doubt suggested by the ingenuity of counsel and (3) the trial court improperly charged the jury by (a) failing to instruct the jury that mere presence at the crime scene, even coupled with knowledge of the crime, is insufficient to establish guilt, (b) instructing the jury that reasonable doubt is not a doubt suggested by the ingenuity of counsel and (c) diluting the state's burden of proof with its motive instruction.

The jury reasonably could have found the following facts. The defendant, who was forty-nine years of age at the time of the murder, had been a friend of the victim, Edward Kerishian, who was in his late sixties, for many years. The two resided in the victim's condominium on Madison Avenue in Bridgeport. The defendant was named in the victim's will as a beneficiary of his estate; specifically, she was to inherit the condominium.

Peter Gonda is the defendant's adult son. The defendant and Peter were constantly in need of money and frequently borrowed money from friends and neighbors. The defendant worked part time as a waitress at a pizza restaurant; Peter was unemployed. At some time prior to the victim's murder, Peter had taken the victim's credit cards and incurred debt, for which he was arrested. Although the victim helped Peter with respect

be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

to the arrest, the victim no longer wanted to associate with Peter.

Prior to March 27, 1996, Holly Marshall, who was Peter's landlord, and James Pavliscak[3] overheard the defendant and Peter discussing plans to kill the victim. The defendant and Peter discussed having put poison in the victim's food and recruiting teenagers to break into the condominium to assault and murder the victim. Peter and the defendant also asked Pavliscak to break into the condominium and kill the victim. Both the defendant and Peter offered to pay the teenagers for their assistance.

On March 26, 1996, the day before the murder, Peter met Pavliscak, who was driving an automobile. Peter asked Pavliscak to provide transportation for the defendant from her place of work. When she entered his automobile, the defendant asked Pavliscak if he would enter her home late at night and kill the victim. Peter volunteered that Pavliscak could kill the victim any way he wanted. The defendant gave Pavliscak a key to the condominium. When they left the automobile at the condominium, the defendant and Peter told Pavliscak that they would call him at 2 or 3 a.m. Pavliscak went home and went to bed. The next day, there were seven pages on his beeper from the defendant's condominium. Pavliscak did not return the calls.

On March 27, Peter telephoned Pavliscak and asked why he had not come to the condominium the night before. Pavliscak told Peter he did not want to kill the victim. Peter told Pavliscak that he had to return the key to the condominium and arranged to meet him in

---

[3] Pavliscak, a teenager, was arrested and charged with murder and conspiracy to murder the victim. He entered into an agreement to plead guilty to conspiracy to commit murder in return for a ten year sentence with the right to argue for a lesser sentence in return for testifying on behalf of the state.

the afternoon. When Pavliscak drove to the arranged meeting place, both the defendant and Peter got into his automobile. Pavliscak gave back the key. The defendant and Peter then asked him to drive them to downtown Bridgeport so they could look for someone. In the meantime, the defendant purchased beer for both Pavliscak and Peter. Pavliscak eventually drove the pair to an apartment complex, which Peter entered. He returned to the vehicle with Edward Garrett. Pavliscak then drove with the three others to the victim's condominium.

When they arrived at the condominium, the defendant entered the building while the men remained outside. Peter spoke to his girlfriend, who drove up after they arrived. Pavliscak and Garrett drank beer and smoked marijuana. The defendant came back outside and told Pavliscak to use the bathroom inside the building. The defendant, Peter, Garrett and Pavliscak went into the condominium. The victim was present in the condominium when the group entered. Shortly thereafter, the victim and Peter began to argue and Peter hit the victim on the head with a beer bottle. Garrett attempted to hit the victim on the head with a beer bottle. The victim, bleeding profusely, fell back, clutching his chest. Pavliscak swung at the victim. The defendant put a belt around the victim's neck and pulled on it along with Peter, Garrett and Pavliscak.

As Pavliscak and Garrett left the condominium, Peter told them not to tell anyone what had happened. Pavliscak then went to work at his supermarket job. The defendant and Peter entered the supermarket later that day to purchase a cleaning product. They asked Pavliscak to let them borrow his automobile, but he refused. Peter threatened to kill Pavliscak and his mother if he told anyone of the murder. The defendant telephoned Pavliscak's pager several times and he telephoned her when he finished working. According to Pavliscak, the

defendant was very upset, saying that she needed him to come to her home. In the meantime, Pavliscak met Garrett and told him that the defendant wanted him to go to her home. Although Pavliscak was reluctant to do so, Garrett urged him to go and accompanied him.

When the two arrived at the condominium, the defendant was there and the victim's body was wrapped in a blanket at the end of a hallway. The defendant wanted Pavliscak to take the body away in his car, but he declined. Peter then came in and told Pavliscak that they needed his help removing the body. When Pavliscak refused, Peter lifted his shirt revealing a pistol. The defendant, Peter and Garrett then placed the victim's body in the backseat of Pavliscak's automobile. The men drove and the defendant walked to a nearby field, where the defendant, Peter and Garrett transported the body from the automobile to the field adjacent to Geduldig Street. The defendant, Peter and Garrett then disposed of bloody clothes and sheets. The carpeting and couch in the condominium, which were covered with blood, were also discarded.

That same day, the defendant reported to the Bridgeport police that the victim was missing. She told the police and others that the victim had gone to New Jersey for Palm Sunday or Easter but had never arrived. She was concerned for his welfare because the victim was mentally ill and got confused. Several times when the police were investigating the victim's whereabouts, the defendant and Peter told the police that the victim had once gone to Texas and Mexico without telling them. The defendant pawned several pieces of jewelry that the victim wore daily and some of his camera equipment.

Detective Giselle Doszpoj became involved in the investigation on April 12, 1996, and spoke to the defendant, who sounded very nervous. The next day, Doszpoj and other officers went to the condominium to talk to

the defendant. When they arrived, Peter was in the condominium and told them that his mother had gone shopping at a building supply store. Doszpoj noticed that there was nothing covering the subflooring in the condominium. Peter explained that the carpeting had sustained water damage and was being replaced. As Doszpoj was leaving the parking lot, the defendant returned carrying floor tiles.

The next day the defendant telephoned Doszpoj and asked her to come to the condominium to see something. During her prior conversations with Doszpoj, the defendant repeatedly talked about Inspector James Gallick, who had investigated the murder of the defendant's sister many years before. Gallick met Doszpoj at the condominium where the defendant showed them the contents of the victim's closet. Although the victim was known to have a gun, the police found none. Doszpoj noticed that the floor of the condominium was now covered with tiles. After the police officers returned to the station, the defendant telephoned Doszpoj and told her that she needed to talk to Gallick right away.

Gallick returned to the condominium. When he arrived, the defendant told him that she had seen something and that she was afraid of some individuals. Gallick informed her that as a police officer he would have to report anything she told him. He asked her to go to the police station to give a statement. As Gallick was taking the defendant to the station, the defendant pointed to a vacant lot and said that something had been put there. When she arrived at the station, the defendant gave the first of two statements to Doszpoj. In her first statement, the defendant said that she had walked in on two men, who had killed the victim and disposed of his body. She gave the men fictitious names. She did not report this to the police because the men

had threatened to harm her, her children and grandchildren. In the meantime, Gallick and another police officer returned to the vacant lot where they discovered the victim's body. A short time after giving the first statement, the defendant told Doszpoj that she wanted to make a further statement. In her second statement, the defendant identified the two men as Ed and Jimmy and said that on the evening of the murder she had helped the men move the victim's body to the lot by Geduldig Street.

An autopsy revealed that the victim had died as the result of a heart attack associated with an assault.

## I

The defendant's first claim is that there was insufficient evidence to sustain her conviction in violation of the fifth and fourteenth amendments to the constitution of the United States and article first, § 8, of the Connecticut constitution. Specifically, the defendant claims that the state failed to prove beyond a reasonable doubt that there was an agreement between the defendant and another person to murder the victim, that there was an overt act in furtherance of the alleged conspiracy and that the defendant had the requisite intent to commit murder. We do not agree.

"When reviewing sufficiency of the evidence claims, we employ a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . .

"[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to

draw only those inferences consistent with innocence. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Orhan*, 52 Conn. App. 231, 235, 726 A.2d 629 (1999).

"We first turn to an examination of the nature of the crime of conspiracy. Conspiracy has long been recognized as an offense separate and distinct from the commission of the substantive offense. *In re Luis R.*, 204 Conn. 630, 637, 528 A.2d 1146 (1987). The commission of the substantive offense and a conspiracy to commit it are separate and distinct crimes. . . . The crime of conspiracy is dependent on clear principles, and has characteristics and ingredients which separate it from all other crimes. Id.

"To prove the crime of conspiracy, in violation of § 53a-48, the state must establish beyond a reasonable doubt that an agreement existed between two or more persons to engage in conduct constituting a crime and that subsequent to the agreement one of the conspirators performed an overt act in furtherance of the conspiracy. *State* v. *Rouleau*, 204 Conn. 240, 258, 528 A.2d 343 (1987); *State* v. *Estrada*, 28 Conn. App. 416, 420, 612 A.2d 110, cert. denied, 223 Conn. 925, 614 A.2d 828 (1992). The state is also obligated to prove that the accused intended the conduct constituting a crime be performed. *State* v. *Rouleau*, supra [258]; *State* v. *Channer*, 28 Conn. 161, 168, 612 A.2d 95, cert. denied, 223 Conn. 921, 614 A.2d 826 (1992). The gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy. . . . *State* v. *Rouleau*, supra [258]. Conspiracy is an inchoate offense the essence of which is an agreement to commit an

unlawful act. . . . The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object. . . . Conspiracy is an anticipatorial offense distinguished by a corrupt agreement by two or more persons to commit a specific crime. . . . *State* v. *Beccia,* 199 Conn. 1, 3, 505 A.2d 683 (1986)." (Internal quotation marks omitted.) *State* v. *Hooks,* 30 Conn. App. 232, 241–42, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993).

"To establish the crime of conspiracy . . . [the state must show] that an agreement was made between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . While the state must prove an agreement, the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . *State* v. *Taylor,* 239 Conn. 481, 495–96, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997)." (Internal quotation marks omitted.) *State* v. *Lopez,* 52 Conn. App. 176, 184–85, 726 A.2d 620, cert. denied, 248 Conn. 917, 734 A.2d 568 (1999).

" 'An overt act is an essential ingredient of the crime of conspiracy; it may be committed by either coconspirator. *State* v. *Walton,* 227 Conn. 32, 48, 630 A.2d 990 (1993).' " *State* v. *Forde,* 52 Conn. App. 159, 170, 726 A.2d 132, cert. denied, 248 Conn. 918, 734 A.2d 567 (1999). "The *Walton* case . . . establish[ed] that the

conduct of one coconspirator can be attributed to another coconspirator to prove an element of a different substantive crime with which only one of the coconspirators is charged. This is so because in a conspiracy, an element of the crime can be attributed to any conspirator, regardless of which conspirator committed that overt act as long as the overt act is in pursuance of the conspiracy, is in furtherance of it and it is reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The overt act in pursuance of a conspiracy does not have to be the same act for all of the conspirators." (Citations omitted.) *Evans* v. *Commissioner of Correction*, 47 Conn. App. 773, 779, 709 A.2d 1136, cert. denied, 244 Conn. 921, 714 A.2d 5 (1998).

Jurors are the arbiters of fact. See *New London Federal Savings Bank* v. *Tucciarone*, 48 Conn. App. 89, 99, 709 A.2d 14 (1998). "Moreover, [i]n evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . Furthermore, [t]his court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Sanchez*, 50 Conn. App. 145, 150, 718 A.2d 52, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

Our review of the record demonstrates that the jury heard evidence that the defendant and her son Peter discussed killing the victim. The two were in need of money and knew that the defendant was to inherit the victim's condominium. They plotted to recruit teenagers to break into the condominium to kill the victim. They tried to poison the victim. The defendant and

Peter both talked to Pavliscak about killing the victim and the defendant gave Pavliscak a key to the condominium. The defendant purchased beer for Peter and Pavliscak on the afternoon of the murder. The defendant let Peter, Garrett and Pavliscak into the condominium. Peter and Garrett struck the victim on the head with beer bottles. The defendant placed a belt around the victim's neck and they all pulled on the belt. The victim died of a heart attack associated with an assault. The next day the defendant pawned the victim's jewelry and camera equipment. We conclude, therefore, that it was not unreasonable for the jury to infer from the facts before it that the state proved beyond a reasonable doubt that the defendant agreed with another to murder the victim, that there was an overt act to further the conspiracy to kill the victim and that the defendant had the requisite intent to murder the victim.

## II

The defendant's second claim is that the state improperly argued that a reasonable doubt is not a doubt suggested by the ingenuity of counsel. She claims that her right to due process and a fair trial pursuant to the fifth, sixth and fourteenth amendments to the United States constitution and article first of the constitution of Connecticut were violated. We are not persuaded.

The defendant, on appeal, takes exception to the following portions of the state's closing argument. At the beginning of his argument, the prosecutor said: "What is reasonable doubt? Of course, His Honor is going to instruct you about this law later. But generally it's a doubt that is based upon reason and the evidence. It is not a doubt that is based on a guess or on sympathy or on the ingenuity of a witness or a lawyer. The state doesn't have to prove its case beyond a possible doubt, to an absolute certainty. We went through this during jury selection. The state only has to prove its case

beyond a reasonable doubt that is based on the evidence."

During rebuttal, the prosecutor said: "If there were one word that we could boil everything that we do here down to, the word is reasonable. I mean first of all the state's burden of proof is, as you well know, is to prove the case beyond a reasonable doubt, which is not beyond all doubt, which is not beyond a doubt that is based on a guess or the ingenuity of an attorney, or on sympathy. It has to be a doubt that is based on reason and the evidence." The defendant did not object to either of these arguments at trial and seeks review of her claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[4]

Our resolution of this claim is governed by *State* v. *Hines*, 243 Conn. 796, 817–18, 709 A.2d 522 (1998), where our Supreme Court, relying on *State* v. *Taylor*, supra, 239 Conn. 504, held that a jury instruction containing language similar to the "ingenuity of counsel" language in the state's final argument was not constitutional in nature and, therefore, was not reviewable under *Golding*. For the same reason, we will not review the defendant's unpreserved claim.

### III

The defendant's final claims are that the trial court improperly charged the jury by (1) failing to instruct the jury that mere presence at the crime scene, even

---

[4] "[W]e hold that a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

coupled with knowledge of the crime, is insufficient to establish guilt, (2) instructing the jury that reasonable doubt is not a doubt suggested by the ingenuity of counsel and (3) diluting the state's burden of proof with its motive instruction. We disagree.

The defendant concedes that she failed to preserve any of these claims at trial, but asks that we review her claims of an improper jury instruction pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 4. Although the defendant claims that the trial court's charge violated her right to due process and a fair trial, she has failed to cite any law to support her position that her claims rise to the level of a constitutional violation. We will, therefore, not review these unpreserved claims of error in the trial court's charge.[5]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] Although we decline to review the defendant's claim concerning the "ingenuity of counsel instruction" because she failed to preserve it, we remind the trial court that our Supreme Court, pursuant to its supervisory power, has instructed trial courts to refrain from using the "ingenuity of counsel" instruction. See *State* v. *Taylor*, supra, 239 Conn. 504.