STATE OF CONNECTICUT *v.* HASSAN EATON
(AC 18313)

O'Connell, C. J., and Schaller and Healey, Js.[1]

---

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued March 2—officially released August 8, 2000

*Richard E. Condon, Jr.*, special deputy assistant public defender, for the appellant (defendant).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *Edward R. Narus*, senior assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Hassan Eaton, appeals from the judgment of conviction, rendered after a trial to the court, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[2] and failure to

---

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

appear in the first degree in violation of General Statutes § 53a-172 (a).[3] On appeal, the defendant claims that the court improperly (1) admitted, in violation of his sixth amendment right to confrontation, a statement made by a witness to the police and (2) failed to take reasonable measures to compel the witness to testify, thereby denying him the right to meaningful cross-examination. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of this appeal. The state filed a five count information charging the defendant with three counts of assault in the first degree and with conspiracy to commit assault in the first degree and failure to appear in the first degree.[4] This case arose out of a shooting that occurred on March 3, 1995, at about 11:45 p.m. in a crowded Hartford dance hall known as the Capitol Hall Club (club). As a result of that shooting, Calvin Smith[5] lost his right eye and Vivian Kutspas suffered a gunshot wound to her leg. Oshia Loman, Shawndrika Stevens and Lakeisha Johnson were all present at the club at the time of the shooting and gave signed statements to Detective Robert Lawlor of the Hartford police department after the shooting. Loman's statement to Lawlor, which was given on March 10, 1995, is the subject of this appeal.

At the trial, the state's first witness was Lieutenant Scott Vinci of the Hartford police department. Vinci had been dispatched to the scene of the shooting at the club. He testified that he arrived there at about 11:43

---

[3] General Statutes § 53a-172 (a) provides: "A person is guilty of failure to appear in the first degree when (1) while charged with the commission of a felony and while out on bail or released under other procedure of law, he wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear, or (2) while on probation for conviction of a felony, he wilfully fails to appear when legally called for a violation of probation hearing."

[4] During the trial, the court dismissed the conspiracy count.

[5] Smith allegedly was a member of the Twenty Love gang.

p.m. and found Smith lying on the floor and learned that Kutspas had been shot in both legs.

The state's next witness was Smith. He testified that he went to the dance at the club with a couple of friends and, upon his arrival, he saw Alvin Waters, Everton Gunther, an individual known as "Small Fry" and the defendant, all allegedly members of a gang known as the Young Guns, standing outside.[6] To gain entrance to the club, a person usually had to go through a metal detector and be searched. Apparently, however, Waters bombarded his way into the club avoiding a security check. According to Smith, he saw Waters inside the club acting "crazy" and saying different things in a loud tone, such as "Fuck Twenty Love."[7]

Smith also testified that he saw the defendant enter the club, but his attention was drawn to Waters when he made eye contact with him.[8] Smith testified that, about a minute later, Waters gave him an "unfriendly look," and then he heard a gunshot and felt pain in his eye. He had been struck in his right eye by a bullet. The last time Smith had seen the defendant before he was shot was about "a minute before [he] got shot," at which time the defendant was somewhere in back of him.

Following Smith's testimony, the state called Loman to testify because she had given a statement on March 10, 1995, to Detective Lawlor implicating the defendant. Immediately after being sworn in, however, Loman stated that she did not want to testify. The court stated, "It's my understanding you're reluctant to testify because of various reasons. Now, I can tell you that there's two ways to go about this. Okay. The easiest and

---

[6] Smith testified that at that time he had known the defendant for about five years.

[7] The Twenty Love gang, Smith's supposed gang, and the Young Guns were rival gangs.

[8] Because Waters was acting in such a crazy manner, Smith said that he was concerned only about what Waters might do.

the most proper way is for you to answer the questions honestly." The court also told her that if she was being threatened, such threats would be investigated and pursued by the police.[9] The court told Loman that if she refused to testify honestly and forthrightly, it had the ability and authority to hold her in contempt of court and to incarcerate her until she decided to testify.[10]

Thereafter, the prosecutor inquired about a meeting that he had had with Loman before going into court that morning, at which he asked her to review her March 10, 1995 statement to the police. She, however, refused to review her statement and claimed that she did not remember anything that had happened at the club. Loman then testified that she had no recollection about the March 3, 1995 incident at the club. She did admit, however, that she was present when the incident took place, that a police officer took her name and that the police came to her home later in March, 1995, to take her to the police station. She also admitted that she told the police in her March 10, 1995 statement what she had observed at the club on the night of the shooting. She further testified that the detective who took her statement, Lawlor, wrote down her account of how the shooting occurred. While on the stand, she identified her signature on each page of the statement as well as

---

[9] Lawlor testified that the police received information that suggested that some witnesses were being coerced not to testify.

[10] At that time, the following colloquy transpired between the court and Loman:

"The Court: [I]n our society when people come forth when they're investigating a crime, people have an obligation and a responsibility to other citizens to testify to what they've seen or heard honestly. Now, I know you're nervous and that is very understandable and this is a lot of pressure on you.

"The Witness: I don't want to be here.

"The Court: I understand that. However, this is a court of law and people have been charged with crimes. You have given statements to the police, I understand, which I haven't read, and you're going to be questioned about those statements. Bear with me and we'll try to go through this procedure."

her initials on a diagonal line on the second page. She also identified her signature on each page where the words, "I have read," were handwritten. She further admitted that the statement, dated March 10, 1995, was the one that she had given to the police.[11] Upon further inquiry, Loman also admitted that when she gave Lawlor her account of the incident in her March 10, 1995 statement, she was being truthful. After that testimony, the court took a recess to allow Loman to read the statement, but, after doing so, she indicated that it did not refresh her recollection as to her observations on the night of the shooting.

Thereafter, the state offered Loman's statement into evidence as a full exhibit pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[12] The defendant objected, claiming that it was not a prior inconsistent statement.[13] He argued that Loman had not testified to anything that was inconsistent with her statement as *Whelan* requires because she never specifically retracted anything that she had said in her statement to the police. According to the defendant, for Loman's testimony to be inconsistent with her March 10, 1995 statement, she would have had to testify that something in that statement did not actually occur. As the defendant points out, Loman merely testified that she could not recall anything in her statement.[14]

---

[11] After first denying that Lawlor read the statement back to her, Loman finally admitted that he had done so.

[12] "In *Whelan*, [our Supreme Court] adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination." (Internal quotation marks omitted.) *State* v. *Robinson*, 56 Conn. App. 794, 798, 746 A.2d 210, cert. denied, 253 Conn. 904, 753 A.2d 938 (2000).

[13] At that time, defense counsel stated, "I certainly will stipulate that the other requirements of *Whelan* have been met."

[14] Defense counsel stated: "She indicated that she didn't want to be here, but the fact is, she is here, and I don't believe that we can speculate as to why she is saying that she doesn't remember the events."

The state argued that *Whelan* was broad enough to allow the admission of the statement. It claimed that *Whelan* applies in the circumstances of this case, namely, when a witness has indicated that she does not want to be in court and that she is not willing to testify and has stated that to the police, the prosecutor and the court. The state claimed that the witness' asserted loss of memory could be considered inconsistent with her prior written statement for purposes of *Whelan*.

The court overruled the defendant's objection and admitted Loman's statement as a full exhibit, finding that *Whelan* was broad enough to allow its admission. In doing so, the court found that Loman was a reluctant witness, that all her answers basically had to be "dragged out of her," that her lack of memory was apparent and that all of this was produced under the pressure of testifying.[15]

On his cross-examination of Loman, the defendant probed into the circumstances under which she gave her statement to the police, including how she got to the police station, how long she was there, how she was questioned, who questioned her, how she answered the questions and whether the police had told her who the person was who had shot the victims at the club. Loman stated that she did not know if there was another person present besides Lawlor when she gave her statement.

Upon completing his cross-examination, defense counsel renewed his objection to the admission of Loman's statement, arguing that because Loman could not recall what had happened, he was essentially put in the position of cross-examining a written statement.

---

[15] After the admission of Loman's statement to the police, the state completed its direct examination of her by obtaining her acknowledgement that she had signed her name to three photographs from police files on March 10, 1995.

He again argued that the statement was not inconsistent with her testimony. The court adhered to its previous ruling allowing the admission of the statement. At that time, the court noted that Loman's testimony was produced reluctantly and that her credibility when answering the questions, including her lack of memory about the particular issue, was very low.

Thereafter, Johnson, who also had given a statement to the police about the shooting, testified that she had arrived at the club between 9:30 p.m. and 10:30 p.m. She further testified that she saw the defendant, Waters and Everton in the club that night,[16] but that she could not recall observing anything Waters had done. Although she heard a gunshot and saw sparks, she did not know where they came from.

Johnson further testified that some time after that night she gave a statement to the police regarding her observations on the night of March 3, 1995. She too, however, had difficulty recollecting the events of that evening. Even after she looked at her statement, she did not recall telling the police that she saw the defendant standing on the dance floor holding a gun as it had been reported in her statement. She did, however, say, "I don't recall [saying] it, but it's in the statement."

Toward the end of her direct examination, when again questioned about the male she had seen standing on the dance floor, she said she could not see him "clearly" because she had seen him only for "a hot second." Shortly thereafter, however, she admitted that her statement to the police was truthful and she stated, "I think I [told the officers that] it was [the defendant]."

Johnson also admitted that on March 7, 1998, she signed the same three police photographs that Loman had signed. She further admitted that in signing the

---

[16] She was not friends with the three men and merely knew of them.

defendant's photograph, the officers had asked her to identify the person that she saw firing the gun and she identified the defendant.

Stevens, who also was under subpoena and had given a statement to the police regarding the shooting, was called next to testify by the state. She and several of her friends had arrived at the club between 11 p.m. and 11:30 p.m. She testified that she saw the defendant, Waters, Everton and Smith, and that she had known the defendant for about six years. Stevens testified that she was standing right behind Smith before and during the incident. She saw Waters look at Smith and heard him making "smart remarks" about the Twenty Love gang, such as "F them." She further testified that, the defendant, who was to her left, was holding something black in his hand that she had recognized to be a gun and that she saw him point it up toward Smith's head. At that point, she heard a gunshot and Smith fell on her. She also heard additional gunshots. She then testified that she saw Smith crawling away toward the bar and that the defendant was alone in the middle of the dance floor. Then, she observed the defendant walking toward the bar area and gunshots were still going off. She saw Waters take off his black coat and give it to the defendant. Waters, thereafter, left by the back entrance to the hall.

Continuing on direct examination, Stevens identified the three police photographs previously marked as exhibits as being those of Waters, Everton and the defendant.[17] On the photograph of the defendant, she had written, "Photo number 7 is the person named Hassan SOH[18] who shot Calvin."[19]

---

[17] She had previously signed each of these photographs when questioned by the police in March, 1995.

[18] "SOH" was a nickname for the defendant.

[19] Later, on cross-examination, she said that she did not see the defendant fire the gun. At that time, she also indicated that she made an "assumption" that the defendant was the shooter. She, however, did not testify to any corrections that she had "suggested" after reading the statement.

The state's next witness was Lawlor, who explained the circumstances under which he took Loman's statement. Lawlor testified that when Loman was originally contacted about being interviewed by the police, she had no problems with it whatsoever and she was willing to cooperate; therefore, the police transported her to the police department. According to Lawlor, Loman's only reluctance was that she feared retaliation because it was allegedly a gang related shooting. Lawlor testified that when he took Loman's statement he typed it on the computer with the monitor facing her so that she could read what he was typing. When Lawlor printed out Loman's statement, she read it, signed it, swore before a notary public that the statement was truthful and also initialed the "I have read" acknowledgement that she had circled herself.[20]

Lawlor further testified that when he served Loman with a subpoena, she again displayed reluctance about testifying. Lawlor explained to her that she could be incarcerated for disregarding a subpoena, and, according to Lawlor, she replied, "I don't care." She eventually stated, however, that she would show up for court.

The state also introduced evidence that the defendant had failed to appear in court on an unrelated matter in April, 1995. The police in Hartford obtained an arrest warrant for the defendant on April 11, 1995, but could not locate him because he had left their jurisdiction. Approximately nineteen months later, on October 28, 1996, the police in Wethersfield, acting on an anonymous tip, located him in a Wethersfield motel. When

---

[20] Lawlor admitted on cross-examination that a redacted version of an incident report of the shooting by Detective James Rovella contained the following: "Loman stated [to Rovella] she was unsure about identifying the party who was shooting but would try." Lawlor also stated, however, that Loman was "extremely confident" of her identification of the defendant as the shooter when she later gave her signed statement on March 10, 1995.

police apprehended him, the defendant gave them a false name. A police officer from the Hartford police department, however, verified that the person that the police had apprehended was the defendant.

After the trial to the court had concluded, the defendant was convicted of assault in the first degree and failure to appear in the first degree. Later, the court made a finding under a part B information that, at the time of the assault, the defendant was free on a pretrial bond and thus subject to an enhanced penalty under General Statutes (Rev. to 1995) § 53a-40b.[21] Thereafter, the court sentenced the defendant on the assault conviction to a seventeen year term of imprisonment, enhanced by a concurrent five year term under § 53a-40b and a second concurrent five year term on the failure to appear charge. The total effective sentence, therefore, was seventeen years of imprisonment. This appeal followed. Additional facts will be discussed where necessary.

I

The defendant claims that the court improperly admitted Loman's written statement to the police under *Whelan*, thereby violating his sixth amendment right to confrontation. We disagree.

First, we must undertake a discussion of whether a witness' prior written statement can be considered "inconsistent" with her testimony under *Whelan* when the witness, at trial, claims that she is unable to recall the circumstances surrounding the making of that statement. Loman, like the declarant in *Whelan*, was a forget-

---

[21] General Statutes (Rev. to 1995) § 53a-40b provides: "A person convicted of an offense committed while released pursuant to sections 54-63a to 54-63g, inclusive, or sections 54-64a to 54-64c, inclusive, may be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not more than ten years if the offense is a felony, or (2) a term of imprisonment of not more than one year if the offense is a misdemeanor."

ful witness, and *Whelan's* reach encompasses inconsistencies arising in a number of contexts. "A statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Citations omitted.) *State* v. *Avis,* 209 Conn. 290, 302, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). "Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Citations omitted; internal quotation marks omitted.) *State* v. *Whelan,* supra, 200 Conn. 748–49 n.4.

Loman's posture at trial can fairly be viewed as what *Whelan* considers "inconsistent in effect," that is, she had given a properly executed statement to the police that she swore was truthful when given, but later failed to recall its contents at trial. We note that the witness in *Whelan* testified in court that he was unable to remember the events involved because he had been intoxicated at the time and that he had been in an

automobile accident that had left him in a coma. Id., 746. In making our determination here, however, we point out that our Supreme Court has stated: "Our analysis in *Whelan* . . . did not focus on the circumstances surrounding the witness' statements in the courtroom. Rather, we carefully examined the circumstances surrounding the out-of-court statement, in order to determine if the statement was made under conditions providing a reasonable assurance of reliability." *State* v. *Borrelli*, 227 Conn. 153, 159, 629 A.2d 1105 (1993). Loman's statement to the police meets the *Whelan* requirements. Accordingly, we conclude that the court did not abuse its discretion in admitting that statement as a prior inconsistent statement.

The defendant claims that allowing Loman's written statement in as a full exhibit under *Whelan* when she could not recall making the statement violated his sixth amendment right to confrontation because he could not meaningfully cross-examine her while she was on the witness stand as required by *Whelan*. When Loman was called to testify, she was shown the statement that she had made to police on March 10, 1995. Loman testified that although she recognized the signature on it as being her own, she did not recall making the statement. The statement, however, was admitted into evidence under *Whelan* over objection by the defendant.

"The issue of whether admission of the statement was proper revolves around *State* v. *Whelan*, [supra, 200 Conn. 743]. In *Whelan*, we adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination.[22]

---

[22] There are other factors, in addition to the those enumerated in *Whelan*, that may enhance the reliability of a prior statement of a witness. See *State* v. *McDougal*, 241 Conn. 502, 510, 699 A.2d 872 (1997) (statement written, signed under oath and declarant advised that it was criminal to give false

. . . A *Whelan* claim is evidentiary in nature and, accordingly, the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial. . . . The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citations omitted; internal quotation marks omitted.) *State* v. *Robinson*, 56 Conn. App. 794, 798, 746 A.2d 210, cert. denied, 253 Conn. 904, 753 A.2d 938 (2000).

"The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . However, [t]he [c]onfrontation [c]lause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"Although it is within the trial court's discretion to determine the extent of cross-examination . . . the preclusion of sufficient inquiry into a particular matter

statement); *State* v. *Hermann*, 38 Conn. App. 56, 67–68, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995) (where prior statement tape-recorded, statement need not be signed because recording of witness' voice imparts same measure of reliability as signature).

tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . The right of confrontation is preserved [however] if defense counsel is permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . .

"While [t]he denial of all meaningful cross-examination into a legitimate area of inquiry fails to comport with constitutional standards under the confrontation clause . . . that is not the situation in this case." (Citations omitted; internal quotation marks omitted.) *State v. Portee*, 55 Conn. App. 544, 558–59 (1999), 740 A.2d 868, cert. denied, 252 Conn. 920, 744 A.2d 439 (2000). Although Loman was uncooperative for the defense as well as for the state in failing to recall her statement to the police even after she was given the opportunity to review it, she did describe in some detail the circumstances of when she gave her statement to the police. She was able to recall that she signed and initialed the statement after it was read to her and that she was present at the club at the time of that incident. Significantly, she testified that the contents of her statement that she gave some ten days after the shooting incident in 1995 were truthful.

Furthermore, Loman was present in court and she was under oath and subject to cross-examination. While Loman asserted that she could not recall the events surrounding the making of her statement to the police and declared discomfort about having to come to court

in the first instance, she did respond to certain questions on direct examination. Therefore, "[t]his is not the situation where a witness did not testify at trial at all . . . or where the trial court completely precluded inquiry into a particular area." (Citation omitted.) Id., 559.

The defendant's confrontation claim also is not aided by his actual cross-examination of Loman. The transcript shows that he made little effort to question Loman about the facts of the shooting incident itself and that most of the questions on cross-examination concerned the circumstances leading up to and including the making of her statement. The defense, however, did elicit from her that she had no recollection of ever telling a police officer on the night of the shooting that she was not sure of the identity of the shooter, but that she would try to make an identification.[23] In addition, defense counsel also sought to impeach Loman's credibility by asking her if she recalled telling a police officer at the scene of the shooting that the only members of the Young Guns gang at the club that she knew were Harold Cook and a person named "TT." She, however, had no recollection of making that statement.

On cross-examination, the defendant had the opportunity to show Loman's bias, interest and motive, which were for the court to assess. Furthermore, the court had the opportunity to observe and assess Loman's demeanor. Given Loman's asserted loss of memory, defense counsel was not without resources in his cross-examination because the court might have been persuaded that Loman's statement to the police was as unreliable as her memory arguably was. The defendant, therefore, was hardly reduced to cross-examining a written statement.

---

[23] This apparently was in reference to an incident report made by Detective Rovella as the result of his talking to Loman at the scene on the night of the shooting.

Our Supreme Court noted in *State* v. *Paulino*, 223 Conn. 461, 470, 613 A.2d 720 (1992), that the "mission of the confrontation clause [is] to advance the accuracy of the truth determining process . . . by assuring that the trier of fact has a satisfactory basis for evaluating the truth of a prior statement." (Internal quotation marks omitted.) "The most successful cross-examination at the time the prior statement was made could hardly hope to accomplish more than has already been accomplished by the fact that the witness is now telling a different, inconsistent story . . . ." *California* v. *Green*, 399 U.S. 149, 159, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970).

The defendant argues that Loman's lack of recollection has precluded him from any meaningful cross-examination of her. "The court, however, did not preclude questioning into any area that defense counsel found relevant to the defendant's case"; *State* v. *Portee*, supra, 55 Conn. App. 559; it was Loman who refused to testify. Under the circumstances of this case, we conclude that the court did not abuse its discretion in admitting the statement under *Whelan*, and that the defendant's sixth amendment right of confrontation was not violated.

## II

The defendant's final claim is that the court improperly failed to take reasonable measures to compel Loman to testify, thereby denying him his right to meaningful cross-examination. We decline to review this claim.

The defendant argues that the court was required to invoke its contempt authority under General Statutes §§ 51-33, 51-33a or 51-35 to compel the reluctant witness with a pattern of selective memory loss to testify. No such claim, however, was made by the defendant at trial, and the defendant never asked the court to invoke

its contempt powers. He therefore seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two requirements involve a determination of whether the claim is reviewable; the second two requirements involve a determination of whether the defendant may prevail." *State* v. *Woods*, 250 Conn. 807, 815, 740 A.2d 371 (1999). This court, however, is free to dispose of a *Golding* claim by focusing on the condition that appears most relevant under the circumstances of the case. *State* v. *Pinnock*, 220 Conn. 765, 778, 601 A.2d 521 (1992).

The defendant claims that because the court did not invoke its contempt authority against Loman his right to cross-examination was violated; therefore, in his opinion, his claim is a constitutional one. The second prong of the *Golding* requires that the claim be of constitutional magnitude alleging the violation a fundamental right. The right of an accused to confront the witnesses against him is guaranteed by the sixth amendment. See *State* v. *Kulmac*, 230 Conn. 43, 55–56, 644 A.2d 887 (2000). It should be pointed out, however, that it is "a fundamental tenet of confrontation clause jurisprudence . . . that the clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." (Internal quotation

marks omitted.) *State* v. *Troupe*, 237 Conn. 284, 292, 677 A.2d 917 (1996). Thus, every evidentiary ruling that a defendant claims implicates his sixth amendment right of confrontation is not constitutional in nature. See *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985).

We are not aware of any authority that supports the proposition that a court's failure to exercise its contempt powers in relation to a witness, as under the circumstances of this case, implicates the right of cross-examination of the defendant. Therefore, although the defendant claims that the court violated his right to cross-examination by not holding Loman in contempt, he has failed to cite any law to support his position that his claim rises to the level of a constitutional violation. See *State* v. *Gonda*, 53 Conn. App. 842, 855, 732 A.2d 793, cert. denied, 250 Conn. 919, 738 A.2d 660 (1999). We will, therefore, not review this unpreserved claim.

The judgment is affirmed.

In this opinion the other judges concurred.