STATE OF CONNECTICUT *v.* HOWARD E. HOPKINS
(AC 19884)

Foti, Schaller and Dupont, Js.

Argued January 25—officially released April 10, 2001

*Vicki H. Hutchinson,* for the appellant (defendant).

*Christopher T. Godialis,* assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan,* state's attorney, and *Patricia M. Froehlich,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Howard E. Hopkins, appeals from the judgment of conviction, rendered after a jury trial, of harassment in the second degree in violation of General Statutes § 53a-183 and threatening in violation of General Statutes § 53a-62. The defendant claims that (1) the evidence of threatening was insufficient to establish his guilt beyond a reasonable doubt, (2) the admission of certain letters he sent to the victim violated his first amendment rights, (3) § 53a-183 (a) (2) is unconstitutionally vague as applied to him, (4) the trial court abused its discretion in imposing a nonfinancial condition of the defendant's pretrial release on bond and (5) a condition of his pretrial release on bond and of his probation impinges on his religious freedom. We affirm the judgment of the court.

The jury reasonably could have found the following facts. The victim and the defendant attended the Church

of Jesus Christ of Latter-Day Saints in Newtown. In addition to being a member of the church, the victim also taught religious education there. The defendant's son was a student in the victim's class at the church. The victim and the defendant exchanged brief pleasantries when they passed one another. A few passing "hellos" was the extent of their contact until the events that are the subject of the criminal charges in this case took place.

Beginning in January, 1995, the defendant mailed the victim unwanted letters and other items. The defendant mailed at least twenty-one letters,[1] varying in length and content, a scarf, a teddy bear and poems. The letters, amounting to no fewer than 139 pages, were replete with declarations of love, marriage proposals, hundreds of pleas for forgiveness, religious teachings, employment discussions and other topics.

The victim repeatedly expressed to the defendant that she wanted him to stop mailing her letters, and the defendant was well aware of her wishes. The victim complained to the church bishop several times after she received the initial letters. The defendant testified that the bishop had yelled at him after the victim had complained about the first letter. The third letter frightened the victim, and she spoke again to church officials. The bishop, the victim, two counselors and the defendant subsequently attended a meeting to address his behavior. According to the victim's testimony, at that meeting she explained to the defendant in clear, simple language and in short sentences to avoid confusion or misunderstanding that she wanted no contact with him. She told him that she had no interest in him, that what he was doing was wrong, that his letters and actions

---

[1] The state introduced only twenty-one of twenty-three letters into evidence because the first two letters did not form a basis for either the threatening charge or the harassment charge.

offended her, and that he was to leave her alone. The defendant's letters reveal that he also understood that his actions were offensive, unwelcome and blatantly inappropriate, that the victim had no interest in him, that he had received repeated warnings and that future contact with her could result in his excommunication from the church. The defendant remained undeterred and continued to send letters despite the victim's unequivocal demands to leave her alone.

The victim received a letter dated July 9, 1998, that caused her to contact the police. In that letter, the defendant informed the victim that it was the fourth letter in twenty-three days since a church official had advised against further contact with her. The letter states: "When I spoke with [the church president], he counseled me that it would not be wise to contact you. His advice did not induce even a moment's hesitation. This is my fourth letter in the twenty-three days since then." The police advised the victim that they could arrest the defendant immediately or warn him that further contact would result in his arrest. The victim opted for the latter, and the police subsequently telephoned the defendant to warn him that his actions violated the law, and told him to cease sending letters.

Several weeks later, the victim received a five page, single-spaced typewritten letter from the defendant dated August 5, 1998. The defendant also enclosed a scarf on which he had silk screened one of his poems. The letter, unlike the previous twenty-two, bore an invented return address and the writing on the envelope did not resemble the defendant's handwriting. The victim did not know that the defendant was the sender until she opened the letter because of the masked handwriting and fictitious return address. In that letter, the defendant referenced his encounter with the police. He wrote: "I got a call from an officer of the Danbury Police Department. . . . He advised me against writing you

any more letters, making any phone calls, or driving by your house. He told me that if you made another complaint, he would have no choice but to arrest me." Later in that letter, the defendant explained that he dismissed the officer's warning because he believed the officer was simply one of the victim's friends and, therefore, not acting in an official capacity.

The August 5, 1998 letter provided the basis for the threatening charge. It states in relevant part: "[U]nderstand that I have been awake for a long time, and I am starting to suffer from it. Sadly, due to the extremity of the current situation, the intent of my method is to tear your heart out so you can take a look at it. I am sorrowful beyond words at this."

The police arrested the defendant, and the state charged him with harassment in the second degree and threatening. On April 14, 1999, the jury returned a verdict of guilty on both charges. On July 15, 1999, the court sentenced him to a total effective sentence of fifteen months incarceration, execution suspended, three years probation and a $250 fine. This appeal followed. We will supply additional facts where the discussions warrant.

I

The defendant first claims that the state did not produce sufficient evidence to sustain a verdict of guilty beyond a reasonable doubt on the threatening charge. The defendant's insufficiency of the evidence claim has two prongs. The first is that the evidence did not sufficiently establish that he threatened the victim, and the second is that the evidence did not sufficiently establish that he ever placed the victim in fear of imminent serious physical injury. We disagree.

Our standard of review is well settled. A defendant who asserts an insufficiency of the evidence claim bears

an arduous burden. We first review the evidence in a light most favorable to sustaining the verdict and then must decide whether the jury reasonably could have concluded as it did. *State* v. *Szymkiewicz*, 237 Conn. 613, 622, 678 A.2d 473 (1996).

Pursuant to § 53a-62 (a), "[a] person is guilty of threatening when: (1) By physical threat, he intentionally places or attempts to place another person in fear of imminent serious physical injury . . . ." The defendant claims that the evidence did not support the jury's conclusion that he threatened the victim. The August 5, 1998 letter formed the basis for the threatening charge. The state relied principally on the following language from that letter: "the intent of my method is to tear your heart out."

## A

The defendant maintains that he intended the words only figuratively and not as a physical threat. He argues that his language is comparable to phrases such as "eat your heart out" or "tug at one's heartstrings." The defendant testified at trial that his intention was always "twofold, to obtain her forgiveness and to encourage her continuing relationship with the church." The defendant's argument as to the intent of his words was a question of fact uniquely for the jury to resolve. *State* v. *Torwich*, 38 Conn. App. 306, 314, 661 A.2d 113, cert. denied, 235 Conn. 905, 665 A.2d 906 (1995). "Intent may be, and usually is, inferred from conduct. . . . and whether such an inference should be drawn was properly a question for the jury to decide." (Citations omitted; internal quotation marks omitted.) *State* v. *Sober*, 166 Conn. 81, 92–93, 347 A.2d 61 (1974).

The jury reasonably could have rejected the defendant's proclamations as to his intent. The defendant sent the threatening letter immediately following a police warning not to contact the victim again. The

defendant, for the first time, disguised his handwriting on the envelope. The defendant also falsified the return address for the first time. The letter reveals a sense of frustration that the victim had contacted the police.[2] In the several months preceding the August 5, 1998 letter, the frequency of the letters and poems increased. Indeed, during the four months preceding the threatening letter, the defendant wrote letters and poems dated April 15, May 2, May 3, May 19, May 25, June 17, June 25, July 1, July 9 and August 5, 1998. We cannot conclude that the evidence viewed in a light most favorable to sustaining the verdict indicates any infirmity in the jury's conclusion. The jury had before it sufficient evidence to conclude that the words at issue revealed the defendant's intent to threaten the victim and not merely to convey a figurative expression.

## B

The defendant also claims that the evidence was insufficient to establish beyond a reasonable doubt the element of "fear of imminent serious physical injury." He argues that the victim's delay in both contacting and actually speaking with the police negates the possibility that she feared for her physical safety. We disagree.

As previously discussed, we evaluate the evidence and the reasonable inferences drawn therefrom in a light most favorable to sustaining the verdict. In so doing, we cannot say that the evidence left the jury

---

[2] In the August 5, 1998 letter, the defendant also wrote: "I was frankly shocked at the simplistic approach you took to resolve the issue(s) you perceive. . . . [A]fter receiving four letters from me in little over three weeks, why did you wait three weeks to do something about it? . . . [W]hat happened? What have I now done? . . . [I]n your consideration, is my letter-writing the sum total of the problem? Does your problem go away if I don't write? Are things really that simple from your aspect? Why did you wait three weeks? Did you carefully ponder your response for that long, or was it indeed a reaction to a more immediate circumstance? Just what do you make of my letters?"

unable to conclude reasonably that the victim feared for her safety. We note that the law does not equate imminent with immediate. A threat does not require "immediate menace of violence or acts showing a present ability and will to execute the threat. That would liken the threat to an assault, which is and always has been a separate offense under our statute and distinct from a threat. A threat imports the expectation of bodily harm, thereby inducing fear and apprehension in the person threatened. A threat, unlike an assault, is not limited by time or distance." *State* v. *Snead*, 41 Conn. App. 584, 593, 677 A.2d 446 (1996). The state produced sufficient evidence from which the jury reasonably could have found that the victim interpreted the defendant's letter as foretelling "probable evil to come." Id., 594.

The victim testified at trial that reading the letter "scared [her] to death." She feared that the defendant "would get pushed over the edge" and was afraid he was going to hurt her. On cross-examination, the victim testified further that on the basis of her training as a nurse and as an emergency medical technician, she knew "of the effects of sleep deprivation, and also [that the defendant was] very distressed in that letter, and in a previous letter he had already talked about [her] in the physical realm, and letters leading up to that talked about sexuality and it had all been progressive, just all leading up to him hurting [her]." In the context of determining whether the state has sufficiently established the element of "fear of imminent serious physical injury," the fact finder can focus on the victim's reasonable perception of the events. It is her fear to which the statute speaks. Here, the jury reasonably could have credited the victim's testimony as to her fearful state.

Moreover, the victim's decision to contact the police evinces a fear for her own safety. She testified at trial that she went to the police station on four consecutive

days because the officer who had started the case was unavailable on several of her earlier visits. Under our deferential standard of review, it was reasonable for the jury to conclude in light of all the evidence that the defendant's words placed or attempted to place the victim in fear of imminent, serious physical injury.

## II

The defendant's second claim is that the admission of his letters into evidence violated his first amendment rights as secured by the federal constitution. This claim must fail in light of *State* v. *Murphy*, 254 Conn. 561, 757 A.2d 1125 (2000), which our Supreme Court decided after the parties submitted their briefs in the present case.

In *Murphy*, the state charged the defendant with, inter alia, a violation of § 53a-183. At trial, the state introduced several letters into evidence to establish the defendant's intent. Id., 569. "At no time did the prosecutor imply that the defendant should be convicted based upon the content of his communications; rather, the prosecutor argued only that those communications were evidence of the defendant's intent to harass, annoy or alarm." Id., 570.

On appeal, the defendant challenged his conviction under § 53a-183, contending "that his conviction was predicated upon the content of the letter that he sent to the victim rather than his conduct in using the mail to harass the victim." Id., 567. Our Supreme Court rejected the argument and concluded that "the fact finder may consider the language used in the communication in determining whether the state has proven the elements of the offense, namely, that the defendant intended to harass, annoy or alarm, and that he did so in a manner likely to cause annoyance or alarm. . . . ('[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a

crime or to prove motive or intent'). Indeed, the use of such evidence may be 'indispensable to a proper determination of whether the statutory requirement of intent to harass ha[s] been proven.' " (Citations omitted.) Id., 569.

We discern no meaningful distinction between *Murphy* and the present case.[3] As did the trial court in *Murphy*, the court here admitted the letters into evidence, but solely for the purpose of establishing intent.[4] The court also immediately instructed the jury that it could consider the letters only for purposes of intent.[5] Accordingly, we conclude that the admission of the letters did not violate the defendant's constitutional right to free speech.

### III

The defendant's third claim is that § 53a-183 (a) (2) is unconstitutionally vague as applied to him.[6] In his brief, the defendant contends that "[n]either the statutory language nor authoritative judicial gloss applied

---

[3] We do note that the defendant in *Murphy* did not object to the admission of the letters, unlike the defendant in the present case. That the defendant in the present case preserved the claim, however, does not affect our conclusion.

[4] The defendant's counsel objected to the admission of the letters. Outside the presence of the jury, each side offered argument as to the admissibility of the letters. Following the arguments, the court stated: "I'm satisfied [they are] admissible, and [they are] relevant [and material] on the question of intent. The jury will be told [that it] can consider [them] on the issue of intent only."

[5] After the court overruled the objection to the admissibility of the letters, the jury returned and the court informed it that the letters were "admissible . . . on the question of what the [defendant's] intent was—nothing else. . . . So, when you are using [them], you're using [them] to determine what his intent may have been or may not have been from the content of the document[s], and that's the only way you can use [those] document[s]."

[6] In its brief, the state argues that we should decline to review this claim because the defendant "has not applied the relevant case law to the virtually undisputed facts of his case." The defendant has, however, referred us to some authority for his arguments. We therefore review the claim.

to [§ 53a-183 (a) (2)] gave [him] sufficient notice that mailing twenty letters to an individual over a period of thirty-three months (11/1/95 through 8/5/98), all sent by regular United States postal service in normal mailing envelopes devoid of any markings other than name and address of sender, and recipient and postage was illegal."[7] We disagree.

The defendant urges review of this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] The record is adequate for review, and the defendant alleges a violation of his due process right to fair warning. He therefore satisfies the reviewability requirements of *Golding*. The defendant fails, however, to establish that a constitutional violation clearly exists that deprived him of a fair trial.

The void for vagueness doctrine accords due process protection in that it requires statutes (1) to provide fair notice of the conduct governed by them and (2) to prescribe minimum guidelines to govern law enforcement. *In re Shane P.*, 58 Conn. App. 244, 253, 754 A.2d 169 (2000). The defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him,

---

[7] In his brief, the defendant also argues that the statute does not give notice as to what manner of mailing would cause annoyance or harm, and, for that reason, it is unconstitutionally vague as applied to him. That argument speaks, however, more to a facial challenge than to an "as applied" challenge. We previously have found that § 53a-183 (a) (2) survives a facial challenge. *State* v. *Snyder*, 40 Conn. App. 544, 551, 672 A.2d 535 ("[w]e conclude that [the language of § 53a-183 (a) (2)] is not ambiguous"), cert. denied, 237 Conn. 921, 676 A.2d 1375 (1996), on appeal after remand, 49 Conn. App. 617, 717 A.2d 240 (1998).

[8] Pursuant to *Golding*, an appellate court may review an unpreserved claim so long as the record is adequate for review and the claim is of constitutional magnitude. *State* v. *Golding*, supra, 213 Conn. 239–40. A defendant who satisfies the first two prongs is then entitled to have this court reach the merits of the claim. The defendant must show that the constitutional violation clearly exists, which violation clearly deprived the defendant of a fair trial and, if the claim is subject to harmless error analysis, that the state has failed to establish harmlessness beyond a reasonable doubt. Id., 240.

deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 322, 732 A.2d 144 (1999).

Section 53a-183 (a) provides in relevant part that "[a] person is guilty of harassment in the second degree when . . . (2) with intent to harass, annoy or alarm another person, he communicates with a person by . . . mail . . . in a manner likely to cause annoyance or alarm . . . ." This court has had the opportunity to examine the statutory language of § 53a-183 (a) (2). In *State* v. *Snyder*, 49 Conn. App. 617, 717 A.2d 240 (1998), we considered and rejected an unconstitutionally vague as applied claim similar to the defendant's in the present case.

The defendant in *Snyder* caused several people to receive hundreds of unsolicited mailings, subscriptions and other packages. Id., 623. He appealed from his conviction under § 53a-183 (a) (2), arguing, inter alia, that the statute was unconstitutionally vague as applied to him. We disagreed because the evidence demonstrated that the defendant in *Snyder* intended to harass the victims by means of the mail, and the execution of his plan indicated that his sole purpose was to harass by ordering vendors to send multiple mailings to the victims. Id., 629. "We conclude that a person of ordinary intelligence would have fair warning that the outrageous conduct of sending unsolicited magazine subscriptions, videocassettes, audio discs, music cassettes, collector plates and cards, and seminar enrollments to victims through the mail in retaliation for perceived harassment would constitute a violation of the statute." Id., 630. Moreover, in *Snyder*, we were unable to conceive of a plausible argument that the defendant "acted in reliance on the belief that his conduct was lawful or that a person of ordinary intelligence would have no

reason to know that he was engaging in prohibited conduct. See *State* v. *Payne*, [240 Conn. 766, 779, 695 A.2d 525 (1997)]; *State* v. *Cummings*, [46 Conn. App. 661, 674, 701 A.2d 663, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997)]." *State* v. *Snyder*, supra, 49 Conn. App. 630.

Similarly, in the present case, the defendant, as the contents of his letters evidence, knew that the victim neither welcomed nor solicited any contact with him. On more than one occasion, church officials intervened, and notified the defendant that the victim did not welcome his conduct and wanted him to stop. The defendant testified at trial that the police had warned him that his conduct was illegal. See *State* v. *George*, 37 Conn. App. 388, 391, 656 A.2d 232 (1995) (police warned defendant just prior to arrest that his conduct could lead to criminal consequences). In light of his own admissions in the letters, the advisements by church officials, the police warning and case law interpreting the statute, we cannot conclude that the defendant did not have fair warning that the statute proscribed his activity or that a person of ordinary intelligence would have no reason to suspect that his conduct was illegal. The defendant, therefore, has failed to show a clear constitutional violation and, consequently, his third claim fails.

## IV

The defendant's fourth claim is that the court, prior to trial, abused its discretion when it imposed a nonfinancial condition on his pretrial release on bond. He argues that the court did not have the authority to impose a nonfinancial condition under Practice Book § 38-4,[9] which governs the terms and conditions that

---

[9] Practice Book § 38-4 provides in relevant part: "(a) Except as provided in subsection (b), when any defendant is presented before a judicial authority, such authority shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient reasonably to assure the person's appearance in court . . .

the court may impose when setting bail or bond. The state counters that the impossibility of reinstating the defendant's pretrial release, either with or without the challenged condition, negates the existence of a controversy, thus rendering the claim moot.[10]

The following additional facts are necessary to place the claim in proper context. At the August 14, 1998 arraignment hearing, the court set bond in the amount of $5000. The defendant posted a surety bond, which allowed for his release. On October 30, 1998, the court denied the defendant's request for accelerated rehabilitation; see General Statutes § 54-56e; and modified the conditions of his pretrial release on bond to include a prohibition from attending the same parish of the church that the victim attended. The defendant never objected to the condition, nor did he seek appellate review of the condition of release.

"(2) The defendant's execution of a written promise to appear with nonfinancial conditions . . . .

"(c) When any defendant charged with the commission of [certain class A, B, C and D felonies] is presented before a judicial authority, such authority shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient reasonably to assure his or her appearance in court and that the safety of any other person will not be endangered . . .

"(2) The defendant's execution of a written promise to appear with nonfinancial conditions . . . .

"(e) If the judicial authority determines that a nonfinancial condition of release should be imposed pursuant to subsections (a) (2) or (c) (2) of this section, the judicial authority shall order the pretrial release of the defendant subject to the least restrictive condition or combination of conditions that the judicial authority determines will reasonably assure the appearance of the defendant in court and, with respect to the release of the defendant pursuant to subsection (c) of this section, that the safety of any other person will not be endangered . . . ."

[10] The state argues, alternatively, that even if the claim is not moot, we should not review it because the defendant did not preserve it at trial, and he failed to claim entitlement to its review pursuant to either *State* v. *Golding*, supra, 213 Conn. 239–40, or the plain error doctrine. See Practice Book § 60-5. The state also asserts that the defendant consented to the condition, thus waiving the claim. We do not address those arguments in light of our conclusion that the claim is moot.

In his brief, the defendant "acknowledges that the issue is moot at this point, but seeks a ruling for future cases." We decline his invitation to engage in a purely gratuitous exercise. It is beyond question that we are without jurisdiction to issue advisory opinions and to "decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 225, 756 A.2d 1264 (2000); *Hechtman* v. *Savitsky*, 62 Conn. App. 654, 657, 772 A.2d 673 (2001).

General Statutes § 54-63g[11] allows defendants to seek immediate review of an allegedly unauthorized condition of pretrial release. The defendant did not avail himself of that statutory right. The parties have tried the case, a jury has convicted the defendant and a court has sentenced him. We cannot, therefore, afford the defendant any practical relief on a claim concerning conditions of pretrial release. Moreover, as conceded by the defendant's counsel during oral argument, a decision by this court would effect no collateral consequences. See *Hechtman* v. *Savitsky*, supra, 62 Conn. App. 657–60. As such, the claim is moot and we do not have jurisdiction to afford review.

V

The defendant's final claim is that the court violated his first amendment right of religious freedom[12] when it barred him from attending the same parish of the church that the victim attended as a condition of both

---

[11] General Statutes § 54-63g provides: "Any accused person or the state, aggrieved by an order of the Superior Court concerning release, may petition the Appellate Court for review of such order. Any such petition shall have precedence over any other matter before said Appellate Court and any hearing shall be heard expeditiously with reasonable notice."

[12] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

his pretrial release on bond and his probation. The state responds that issue of the constitutionality of a pretrial condition is moot. The state also argues that the defendant inadequately briefed the issue of whether the condition of postconviction probation is constitutional.[13] We agree with the state.

## A

Again, in his brief, the defendant states that he "understands that at this point the issue as to the ban imposed as a condition of pretrial bond may be moot, but seeks a ruling from the court nevertheless to establish a standard for future cases." The constitutionality of the prohibition as a condition of pretrial release on bond is moot for the same reasons set forth in part IV. We have no jurisdiction to decide the issue.

## B

The defendant also argues that the postconviction condition of probation violates his right of religious freedom. He appears to argue that the free exercise clause of the first amendment guarantees the broad right to attend specific services at a specific parish of a specific church of one's own choice.

The defendant did not object to the condition at the time the court imposed it. Indeed, he agreed to the terms of probation, which included the prohibition from attending the same church that the victim attended. In his brief to this court, the defendant fails to indicate the type of review he seeks of this unpreserved claim. The law restricts our review of unpreserved claims to extraordinary circumstances such as review pursuant

---

[13] The state argued, alternatively, that the condition is constitutional because it is part of a comprehensive "no contact with the victim" order. It also argued that the defendant acquiesced to the condition. In light of our conclusion that the defendant inadequately briefed the issue, we do not address its constitutionality or the defendant's alleged waiver.

to the constitutional bypass doctrine of *Evans-Golding*; see *State* v. *Golding*, supra, 213 Conn. 239–40; *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973); plain error review; see Practice Book § 60-5; or review pursuant to our general supervisory powers. See Practice Book § 60-2. The defendant fails to indicate why he has not waived any constitutional entitlement he might have had to such a broad right as he now asserts or specifically why the condition is unconstitutional. We decline to review his claim.

The judgment is affirmed.

In this opinion the other judges concurred.