## STATE OF CONNECTICUT *v.* MICHAEL LIEBOWITZ
### (AC 18558)

Mihalakos, Dranginis and Dupont, Js.

Argued April 27—officially released September 25, 2001

*Moira L. Buckley,* deputy assistant public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* assistant state's attorney, with whom, on the brief, was *John Cronan,* acting state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Michael Liebowitz, appeals from the judgment of conviction, rendered following a jury trial, of burglary in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-101 (a) (2), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (2), two counts of assault in the third degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-61 (a) (1) and (2), conspiracy to commit assault in the third degree in violation of General Statutes §§ 53a-48 and 53a-61 (a) (1) and hindering prosecution in violation of General Statutes § 53a-166. On appeal, the defendant claims that (1) there was insufficient evidence to support his conviction of conspiracy to commit burglary, burglary in the first degree as an accessory and hindering prosecution, (2) the conviction

of conspiracy to commit burglary and conspiracy to commit assault violates the double jeopardy prohibition,[1] (3) the trial court improperly allowed hearsay testimony of a coconspirator without determining whether a conspiracy existed at the time that the statements were made and (4) the court improperly instructed the jury that it could find the defendant guilty of conspiracy on the basis of liability as expressed in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), and *State* v. *Walton*, 227 Conn. 32, 43–54, 630 A.2d 990 (1993). We reverse in part and affirm in part the judgment of the trial court.

The jury reasonably could have found the following facts.[2] The defendant and Loni Rocheleau, one of the victims, began dating in August, 1995. In August, 1996, their relationship ended. Rocheleau and Hector Soto, the other victim, began dating in December, 1996, and living together in an apartment in Tolland in August, 1997.

The relationship between Soto and Rocheleau angered the defendant, which anger led the defendant to harass and threaten Soto. On September 28, 1998, the defendant, over the telephone, asked Soto if he wanted to fight him. The defendant then told Soto that

---

[1] The state agrees that this unpreserved claim is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and concedes that conviction and sentencing for multiple offenses of conspiracy on the basis of a single agreement violates the double jeopardy protection against multiple punishments for the same offense in a single trial. The remedy for the double jeopardy violation is to remand the case to the trial court with direction to combine the two conspiracy convictions and to vacate the lesser sentence. See *State* v. *Chicano*, 216 Conn. 699, 725, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991). The state's concession is correct, and we need not discuss the issue further. We, as an intermediate appellate court, may not accept the defendant's suggestion that we overrule *Chicano*.

[2] Two of the alleged coconspirators, Peter Pietraroia and Brian Araujo, testified at trial. The defendant and a third alleged coconspirator, Kenny Johnson, did not testify.

he still cared for Rocheleau and that he would kill for her. Soto asked the defendant to leave them alone. Following that conversation, Soto believed that the situation had been defused and did not believe that the defendant still harbored resentment toward him and Rocheleau.

On September 29, 1998, the defendant asked Peter Pietraroia and Brian Araujo to come to his house in Wethersfield. The defendant also invited Kenny Johnson to the house. At his house, the defendant asked Pietraroia to give Johnson a ride to Tolland to assault Soto. According to Pietraroia's testimony, he believed that the defendant was frustrated, upset, angry, bitter and determined to carry through with the assault. Pietraroia testified that he was afraid to say no.

Between 9 and 10 p.m., the four men went to a bar in Hartford to discuss the plan. After some discussion, the four men agreed that Pietraroia would drive Johnson to Tolland, that Johnson would knock on the door or ring the doorbell and hit Soto in the mouth, that Araujo would shout that Soto was to stay away from his sister in Mansfield and that Pietraroia would ensure that Johnson escaped without incident. After the assault, Pietraroia was to drive Johnson and Araujo back to the defendant's house.

After developing the plan, the four men returned to the defendant's house around 10 p.m. The defendant and Johnson retrieved T-shirts from inside the defendant's house to use as masks and then got into the defendant's vehicle. Pietraroia and Araujo, not knowing the route, followed the defendant's vehicle, which the defendant was operating, to Tolland. Once near Soto's and Rocheleau's apartment, Johnson exited the defendant's automobile and entered Pietraroia's automobile. The defendant instructed the others to return to his house after the assault and he then departed. Pietraroia

backed his vehicle into Soto's driveway to ensure a quick escape. Johnson and Pietraroia donned the T-shirts as masks, but Araujo did not wear one because Rocheleau had never seen him before.

The three men then approached the unlit apartment. Soto and Rocheleau had retired early that evening and neither responded to the doorbell or the knock at the door. The three then tried the door, which was unlocked. Johnson entered first, and Pietraroia and Araujo followed. They made their way through the dark apartment into the bedroom where Johnson turned on the bedroom light. Johnson hit and stabbed Soto, twice in the left arm, once on his side and once in the leg. Rocheleau suffered a stab wound to her knee. Araujo yelled leave my sister alone and stay out of Mansfield. Soto jumped up, and Pietraroia hit him in the forehead to prevent Soto from grabbing him.

Following the attack, the three men fled the apartment. Rocheleau and Soto telephoned the police, who arrived at the scene around 11 p.m. Rocheleau later identified a photograph of Araujo as one of the men who was in the bedroom during the attack.

Pietraroia drove Johnson and Araujo near the defendant's house and dropped them off. He gave his T-shirt to Johnson and then left. Johnson and the defendant talked in the kitchen while Araujo retrieved his clothes from the defendant's bedroom. Araujo heard the defendant say, "I told you to beat him up, not hack him up," and thought the defendant seemed shocked. The defendant then directed Johnson to back the defendant's automobile out of the garage so that he could take Johnson and Araujo home. As Johnson was backing the vehicle out of the garage, Officer John Salvatore of the Wethersfield police department arrived at the defendant's house and arrested Johnson and Araujo. The

defendant then emerged from the house, and Salvatore arrested him as well.

At the police station, the defendant gave several statements to the police. According to his statements, the defendant instructed the others only to slap Soto around and not to hurt Rocheleau. He also informed the police that after Johnson and Araujo had returned to his house, he cleaned and hid the knife and the bloody clothes. The defendant consented to a search of his attic, where he claimed to have hidden the knife and clothes, but the police recovered neither the T-shirts nor the weapon.

According to Araujo's testimony, Johnson, Pietraroia and the defendant discussed the plan at the bar. Because Araujo was not twenty-one years old, he could not sit at the bar where the other three had drinks. For that reason, he testified that he was unaware of the plan to assault Soto. Both Pietraroia and Araujo testified at trial that the plan included only punching Soto, not breaking into the apartment or injuring Rocheleau. Pietraroia also testified that the defendant initially admitted to showing the knife to Johnson in the lead car en route to the apartment in Tolland.

The state charged the defendant in a nine count information. The jury found the defendant guilty of six of those counts. In addition to the crimes of which the jury found the defendant guilty, the defendant pleaded guilty to a part B information of committing crimes while released on bond in violation of General Statutes § 53a-40b. The court sentenced the defendant to a total effective sentence of twenty-seven years, to run consecutively to a sentence previously imposed. This appeal followed.

I

The defendant first challenges the sufficiency of the evidence concerning three counts, conspiracy to com-

mit burglary in the first degree, burglary in the first degree as an accessory and hindering prosecution. We find his claim unavailing as to his conviction on each count.

The defendant properly preserved his claim for our review. At the close of the state's case, the defendant filed a motion for a judgment of acquittal, claiming that insufficient evidence existed on which the jury could convict him of all counts charged, and he declined to present a defense after the court denied the motion. In denying the motion, the court stated: "I think there is a prima facie case under the *Pinkerton* rule[3] and under the evidence that's been presented to the jury, so I'll deny the motion for judgment of acquittal on all counts with respect to the burglary. With respect to the assault charges . . . [t]here is sufficient evidence there to present the case, prima facie case, to the jury, and with respect to the hindering prosecution . . . the same situation applies. So, I'm going to deny the motion."

We invoke a two part test in reviewing sufficiency of the evidence claims. First, this court must construe the evidence in a light most favorable to sustaining the

---

[3] "Under the *Pinkerton* doctrine, a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. *State* v. *Diaz*, [237 Conn. 518, 526, 679 A.2d 902 (1996)], citing *Pinkerton* v. *United States*, [supra, 328 U.S. 647–48]." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 715 n.15, 756 A.2d 799 (2000). Our Supreme Court adopted the *Pinkerton* doctrine in *State* v. *Walton*, supra, 227 Conn. 45–46. *Pinkerton* and *Walton* concern a defendant's liability for *substantive* criminal offenses committed by a fellow conspirator. The doctrine has no applicability where the defendant's liability for the conspiracy itself is at issue. In the present case, the court referred to the doctrine when it addressed whether the state had produced sufficient evidence to avoid the granting of a motion for judgment of acquittal with respect to the defendant's liability for the conspiracy itself. We discuss the *Pinkerton* doctrine in greater detail in part III of this opinion where the defendant claims that the court improperly instructed the jury.

verdict. Second, we determine whether a jury reasonably could have concluded that the evidence and the inferences drawn therefrom established the defendant's guilt beyond a reasonable doubt. *State* v. *Hopkins*, 62 Conn. App. 665, 670, 772 A.2d 657 (2001).

A

Pursuant to § 53a-48 (a), "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." Pursuant to § 53a-101 (a) (2), "[a] person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

Conspiracy, therefore, requires two intents. "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Beccia*, 199 Conn. 1, 3–4, 505 A.2d 683 (1986). The defendant specifically challenges the latter intent. He claims that the state presented insufficient evidence from which the jury could conclude beyond a reasonable doubt that the defendant intended the others to commit the elements of burglary.

In his brief, the defendant argues that he never agreed with Pietraroia, Johnson or Araujo that they would

enter the apartment to assault Soto. He claims that he therefore "lacked the intent that conduct constituting burglary be performed." The defendant principally relies on the testimony of Pietraroia and Araujo, both of whom testified that the plan involved punching Soto in the mouth, not breaking into the house to assault Soto. According to the defendant, the plan contemplated an assault outside the confines of the apartment, and thus no burglary was intended.

Intent, as the court instructed the jury, often involves the evaluation of circumstantial evidence because direct evidence of the defendant's state of mind is rare. *State* v. *Kenney*, 53 Conn. App. 305, 312, 730 A.2d 119, cert. denied, 249 Conn. 930, 733 A.2d 851 (1999). A jury may infer intent from the facts and circumstances of the case. "[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Gonda*, 53 Conn. App. 842, 851, 732 A.2d 793, cert. denied, 250 Conn. 919, 738 A.2d 660 (1999). "[T]he jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." *State* v. *Dumlao*, 3 Conn. App. 607, 616–17, 491 A.2d 404 (1985).

In the present case, the jury heard testimony from two of the coconspirators concerning the scope of the plan. The jury was free to disbelieve that testimony in whole or in part. See *State* v. *Roy*, 38 Conn. App. 481, 489–90, 662 A.2d 799 (1995), cert. denied, 237 Conn. 902, 674 A.2d 1333 (1996). The state presented circumstantial evidence from which the jury reasonably could have inferred that the defendant intended the assault to occur regardless of where it actually took place. The

men set off to commit the assault around 11 p.m. A jury could have inferred that the defendant intended the assault to occur whether inside or outside the apartment due to the likelihood that no one might answer the door at such a late hour or that the assault would take place over the threshold of the victims' apartment if the door was opened, coupled with his relentless insistence that the assault occur that night. Moreover, the defendant could not have known whether Soto or Rocheleau would answer the door. Had Rocheleau answered it, it is unlikely that she would have politely asked the masked men, one of whom also was brandishing a knife, to wait patiently at the doorstep while she asked Soto to come to the door. Furthermore, upon receiving no answer, the three men do not appear to have hesitated to enter the apartment or to have discussed whether they should enter. The immediate decision to enter could have led the jury to conclude that the defendant and his coconspirators intended to commit the assault on Soto irrespective of the location. The jury reasonably could have inferred from the facts and circumstances that the defendant intended his coconspirators to commit burglary.

The state also cites *State* v. *Adorno*, 45 Conn. App. 187, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997), as support for its position that it adduced sufficient evidence at trial from which the jury reasonably could have concluded that the defendant intended a burglary. In *Adorno*, the defendant claimed that the evidence was insufficient to sustain his conviction of burglary. The defendant in that case specifically challenged the evidence surrounding whether an entry had occurred. This court determined that a jury reasonably could conclude that an entry occurred where the defendant kicked open a locked door. "[I]t was reasonable for the jury to conclude that at least some part of the defendant's body, his hand or foot for example, intruded

into the victim's apartment. Common sense dictates that it would be reasonable to conclude that, in using the force necessary to kick open a locked door, the momentum would carry the defendant or one of his companions into the victim's apartment." Id., 195. Similarly, in the present case, even if the defendant only intended Soto to be punched in the mouth while standing at the door inside the apartment, a burglary would have occurred once the assailant's fist breached the plane of the entryway into the house.

The defendant attempts to buttress his insufficiency of the evidence claim by emphasizing that the court relied on *Pinkerton* in denying the motion for judgment of acquittal at the close of the state's case. Although we agree that the court improperly relied on *Pinkerton* liability concerning the conspiracy charges, which we discuss in more detail in part III of this opinion, the court properly denied the motion for judgment of acquittal. A court should deny a motion for judgment of acquittal where there is sufficient evidence from which the jury could conclude that a defendant committed the crimes charged. Although the court in the present case applied the wrong legal analysis, its decision was correct. See *Groton* v. *Commission on Human Rights & Opportunities*, 169 Conn. 89, 101, 362 A.2d 1359 (1975) ("[w]e need not be concerned with the validity of the court's theory in support of [the] judgment; since the judgment is correct it must stand"). We conclude that, viewing the evidence in a light most favorable to sustaining the verdict, from the facts established and the reasonable inferences to be drawn therefrom, the jury reasonably could have found that the defendant intended a burglary.

## B

The defendant also claims that insufficient evidence existed to convict him of burglary in the first degree as an accessory. We disagree.

Pursuant to § 53a-8 (a), "[a] person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender." The defendant's conviction, therefore, of burglary in the first degree as an accessory requires that he act with the mental state required for the commission of burglary. *State* v. *Crosswell*, 223 Conn. 243, 260, 612 A.2d 1174 (1992). In other words, he must harbor the same intent as one of the principals charged with the same crime. See id.

The defendant's challenge to the accessory conviction is essentially the same as his challenge to his conspiracy conviction. In his brief, the defendant argues that "the state has failed to prove that [he] acted with the mental state required for commission of burglary. Specifically, the state offered no evidence that the defendant aided his codefendants in entering [Soto's] apartment with the intent to commit a crime [therein]." We find his argument unpersuasive here for the same reasons that we discussed in part I A of this opinion. There was sufficient evidence, direct and circumstantial, that the defendant intended that the others enter Soto's apartment to assault him.

C

The defendant also claims that the evidence was insufficient to convict him of hindering prosecution. We disagree.

Pursuant to § 53a-166 (a), "[a] person is guilty of hindering prosecution in the first degree when he renders criminal assistance to a person who has committed a class A or class B felony or an unclassified offense for which the maximum penalty is imprisonment for more than ten years." Criminal assistance is defined in

General Statutes § 53a-165 as follows: "[A] person 'renders criminal assistance' when, with intent to prevent, hinder or delay the discovery or apprehension of, or the lodging of a criminal charge against, a person whom he knows or believes has committed a felony or is being sought by law enforcement officials for the commission of a felony, or with intent to assist a person in profiting or benefiting from the commission of a felony, he: (1) Harbors or conceals such person; or (2) warns such person of impending discovery or apprehension; or (3) provides such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; or (4) prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person or in the lodging of a criminal charge against him; or (5) suppresses, by an act of concealment, alteration or destruction, any physical evidence which might aid in the discovery or apprehension of such person or in the lodging of a criminal charge against him; or (6) aids such person to protect or expeditiously profit from an advantage derived from such crime."[4]

In the present case, the state produced evidence of two distinct methods by which the defendant rendered

[4] The defendant argues that we should interpret our state statute in the same manner as the federal counterpart, 18 U.S.C. § 1503. That statute specifically forbids the influencing, intimidation, or impeding of any witness, juror, or court official and contains an omnibus clause, which punishes the general obstruction of the "due administration of justice." The omnibus clause covers "[w]hoever corruptly or by threats or force, or by any threatening letter or communication . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice . . . ." 18 U.S.C. § 1503. The United States Court of Appeals for the Second Circuit has determined that § 1503 requires the existence of an ongoing criminal proceeding. See *United States* v. *Ardito*, 782 F.2d 358, 362 (2d Cir.), cert. denied, 476 U.S. 1160, 106 S. Ct. 2281, 90 L. Ed. 2d 723, cert. denied sub nom. *Pollina* v. *United States*, 475 U.S. 1141, 106 S. Ct. 1792, 90 L. Ed. 2d 338 (1986). We decline the defendant's invitation to interpret our state statute in a similar manner because our statute contains different language. Specifically, our statute is broader in that it includes "the lodging of a criminal charge."

criminal assistance to his coconspirators. First, the police arrested Araujo and Johnson in the defendant's automobile. That evidence sufficiently demonstrated that the defendant provided his coconspirators with transportation to avoid discovery or apprehension in violation of § 53a-166 (a). The defendant argues that because the police arrested Araujo and Johnson as they were exiting the garage, the defendant could not have hindered prosecution. The statute simply states that one is guilty of hindering prosecution where he or she provides transportation or other means of avoiding discovery or apprehension. It does not require that the person to whom the defendant provided that transportation successfully evade arrest through the use of that automobile.

Second, Araujo testified at trial that when he and Johnson returned to the defendant's house after the assault, the defendant cleaned the T-shirts and knife. That testimony sufficiently established that the defendant suppressed, by an act of concealment, alteration or destruction, physical evidence that might aid in the discovery or apprehension or in the lodging of a criminal charge against a person who the defendant knew or believed had committed a felony. The defendant responds that he "immediately upon apprehension" informed the police that he had hidden the knife and T-shirts in his home, consented to a search and offered to assist in that search. He claims that those acts negate any claim that he hindered prosecution with respect to the physical evidence. It is of little moment whether the defendant later assisted the police, as the statute contains no exculpatory clause absolving a defendant of liability should he later determine, upon arrest, that it is in his best interest to aid the authorities. Moreover, the police never discovered the weapon. The fact remains that there was sufficient evidence from which a jury reasonably could have concluded that the defen-

dant hindered prosecution by washing and hiding physical evidence.

The defendant also argues that at the time he washed and hid the clothes and knife, he was unaware that the police were seeking him or any of his coconspirators for the commission of a crime. The statute, however, also applies to "a person whom he knows or believes has committed a felony . . . ." The defendant, having been the individual who solicited the crime and who washed a bloody knife and bloody T-shirts, cannot argue that he did not know or believe that his coconspirators had committed a felony.

## II

The defendant next claims that the court improperly admitted hearsay statements of a coconspirator without first determining whether a conspiracy existed at the time that the coconspirator made the statements and that the court should have excluded the hearsay testimony sua sponte. The defendant argues that the statements were not made in the furtherance of the conspiracy and, therefore, do not fall within any exception to the hearsay rule. The defendant alleges a constitutional deprivation in that the statements deprived him of his sixth amendment right to confront witnesses against him guaranteed by the federal constitution.

The state takes three alternate positions: First, the defendant's unpreserved claim is not reviewable; second, even if we assume that the claim is reviewable, the statements were admissible; and third, even if the statements were not admissible, the defendant suffered no harm as a result of their admission. We agree with the state's third position.

During its direct examination of Pietraroia, the state elicited certain statements made by Johnson to Pietraroia after the assault. Defense counsel neither objected

to the questions nor asked the court to strike the answers. The following colloquy occurred:

"[State's Attorney]: All right. Any discussion in the car, sir, as to what had taken place?

"[Pietraroia]: Yes. Just the whole shock of a knife being involved and what happened, entering into a dark environment like that, that wasn't the plan, and I asked [Johnson], you know, what the hell he was thinking for not only entering the house, but pulling out a knife. And at first he replied that [the defendant] told him to do the stabbing, and then he told me that he's the type of guy that would do anything for a friend.

\* \* \*

"Q. Okay. Any discussion about where he got the knife from?

"A. [Johnson] said [the defendant] showed it to him in the car.

"Q. In what car?

"A. In [the defendant's] car on the way up there."[5]

We review the defendant's unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6] "[A]n appellate court may review an

---

[5] For purposes of this discussion, we treat each of the challenged statements as hearsay. The defendant did not testify at trial. As the declarant of the statements, the court would have deemed him to be unavailable as a witness because of his testimonial privilege. See *State* v. *Schiappa*, 248 Conn. 132, 142 n.12, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999). His statements against penal interest and his unavailability as a witness would in all likelihood have rendered the statements admissible as an exception to the hearsay rule. *State* v. *DeFreitas*, 179 Conn. 431, 449–52, 426 A.2d 799 (1980); Conn. Code Evid. § 8-6 (4).

[6] The defendant urges review pursuant to the plain error doctrine, relying on *State* v. *Lynch*, 21 Conn. App. 386, 574 A.2d 230, cert. denied, 216 Conn. 806, 580 A.2d 63 (1990). In *Lynch*, the defendant failed to object to the trial court's admission of a coconspirator's hearsay statement. The trial court later instructed the jury that it had "the duty to determine whether the state had proven a prima facie case of conspiracy independent of the coconspirator's statement." Id., 391. On appeal, this court determined that the court's

unpreserved claim so long as the record is adequate for review and the claim is of constitutional magnitude. [Id.] A defendant who satisfies the first two prongs is then entitled to have this court reach the merits of the claim. The defendant must show that the constitutional violation clearly exists, which violation clearly deprived the defendant of a fair trial and, if the claim is subject to harmless error analysis, that the state has failed to establish harmlessness beyond a reasonable doubt. Id., 240." *State* v. *Hopkins*, supra, 62 Conn. App. 675 n.8. "In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." *State* v. *Golding*, supra, 240.[7]

For purposes of our discussion, we treat the statements as improper hearsay not falling within any hearsay exception[8] and analyze the statements as if the court

submission of that question to the jury amounted to plain error because the court improperly had delegated a duty to the jury. Id. We did not hold in *Lynch* that the court committed plain error in failing to make a sua sponte determination.

[7] The state maintains that *Golding* review is inappropriate because the defendant, in his brief, summarily states that his confrontation clause rights were violated without any citation to authority or analysis. Although the defendant did not provide this court with an overwhelming analysis of his claim, neither an inadequate briefing of a constitutional issue nor a failure to invoke the word "Golding" prevents us from reviewing the claim. See *State* v. *Roy*, 233 Conn. 211, 212–13, 658 A.2d 566 (1995). We would decline review, however, if the defendant treated the issue as evidentiary and if the claim was patently nonconstitutional. See *State* v. *Bruno*, 236 Conn. 514, 554, 673 A.2d 1117 (1996).

[8] It is well settled that a court may properly admit statements made by a coconspirator as an exception to the hearsay rule. *State* v. *Couture*, 218 Conn. 309, 322, 589 A.2d 343 (1991); *State* v. *Jones*, 60 Conn. App. 866, 878, 761 A.2d 789 (2000), cert. denied, 255 Conn. 942, 769 A.2d 59 (2001); Conn. Code Evid. § 8-3 (1) (D). In *State* v. *Vessichio*, 197 Conn. 644, 654–55, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986), our Supreme Court held that before coconspirator statements may be admitted as an exception to the hearsay rule, the court must make a preliminary determination, by a preponderance of the evidence, that there is sufficient independent evidence to establish (1) that a conspiracy existed,

should not have admitted them. In other words, we will assume that the claim is subject to harmless error analysis to determine if the state established harmlessness beyond a reasonable doubt. We conclude that the state can establish harmlessness beyond a reasonable doubt and that, therefore, the defendant cannot prevail.

The defendant challenges as hearsay only those statements concerning his complicity in Johnson's use of the knife. The jury acquitted the defendant of all charges requiring knowledge of or agreement to the use of the knife.[9] Thus, the statements had no effect on the jury verdict and were harmless. Regardless of the state-

(2) that the conspiracy was still in existence at the time the statements were made, (3) that the declarations were made in furtherance of the conspiracy and (4) that the declarant and the defendant participated in the conspiracy. See also footnote 5.

[9] The jury acquitted the defendant of the charges of burglary in the first degree as an accessory, count one, and conspiracy to commit burglary in the first degree, count two, both of which require being armed with a dangerous instrument. The defendant's conviction of burglary in the first degree as an accessory in violation of §§ 53a-8 and 53a-101 (a) (2), and conspiracy to commit burglary in the first degree in violation of §§ 53a-48 and 53a-101 (a) (2), counts three and four, did not contain a dangerous instrument element. In counts five, six and seven, the state charged the defendant with assault as an accessory and conspiracy to commit assault in the first degree; the jury convicted the defendant of only the lesser included offenses of assault in the third degree as an accessory and conspiracy to commit assault in the third degree. During its charge concerning lesser included offenses with respect to assault, the court specifically stated: "Note the difference between assault in the second degree and assault in the third degree. Assault in the second degree involves the intent to physically injure another by means of a dangerous instrument and actually physically injuring another, but using a dangerous instrument. Assault in the third degree does not have the element of a dangerous instrument. It simply states that the state—the defendant had to intend to cause physical injury to another person, mere physical injury, and that the defendant did cause physical injury to that person." The defendant was acquitted of reckless endangerment in the first degree as an accessory, count eight, which did not require the use of a deadly instrument. Finally, count nine, hindering prosecution, does not require the use of a deadly instrument.

ments' admissibility or any obligation of the court to conduct a preliminary determination sua sponte,[10] the state has shown that the admission of the statements was harmless beyond a reasonable doubt. A constitutional error is harmless if it appears beyond a reasonable doubt that the error did not contribute to the verdict. *State* v. *Spillane*, 255 Conn. 746, 757, 770 A.2d 898 (2001).

Furthermore, the defendant attacks the admission of the statements because he claims that they were not made in furtherance of the conspiracy. The defendant's argument is unsound. " '[A] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any coconspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . .' 3 F. Wharton, Criminal Evidence (14th Ed. Torcia 1987) § 609, pp. 739–40, citing *Dutton* v. *Evans*, 400 U.S. 74, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970); *United States* v. *Medina*, [761 F.2d 12 (1st Cir. 1985)]; *United States* v. *Zabic*, 745 F.2d 464 (7th Cir. 1984)." *State* v. *Booth*, 250 Conn. 611, 635, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

III

The defendant's final claim involves the court's instruction to the jury regarding the crime of conspiracy. The defendant argues that the court improperly instructed the jury that it could find him guilty of conspiracy on the basis of *Pinkerton* liability. The state agrees that the *Pinkerton* language was improper, but argues that the charge as a whole and the proper supplemental charge sufficiently ensured that the jury was not misled. We agree with the state.

---

[10] We do not necessarily agree that the court has any such obligation.

The defendant seeks review of this claim pursuant to either the plain error doctrine; Practice Book § 60-5; or *State* v. *Golding*, supra, 213 Conn. 239–40. We will review the defendant's claim pursuant to *Golding* because the record is adequate for our consideration of his claim and an improper jury instruction may violate a defendant's due process right to a fair trial. See *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995). The defendant's claim fails, however, because the state has demonstrated that it was not reasonably possible that the charge misled the jury.

"We note, preliminarily, that our analysis of the defendant's claim begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . *State* v. *Valinski*, 254 Conn. 107, 119–20, 756 A.2d 1250 (2000)." (Internal quotation marks omitted.) *State* v. *Scott*, 256 Conn. 517, 527, 779 A.2d 702 (2001).

After first having charged the jury properly with respect to count two, conspiracy to commit burglary in the first degree,[11] the court improperly charged as follows: "Once the defendant's participation in the conspiracy is established, he is responsible for each of

[11] Although the jury found the defendant not guilty of this count, we quote that part of the charge because the court referred back to that instruction when it charged the jury on the latter two conspiracy charges, of which the jury found the defendant guilty.

the criminal acts of the other coconspirators which is within the scope of the conspiracy, in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the conspiracy." The court then concluded its charge on count two as follows: "If you conclude beyond a reasonable doubt that the defendant was a member of the conspiracy and that burglary in the first degree . . . was within the scope of and in furtherance of the conspiracy, then the defendant would be guilty of conspiracy to commit burglary in the first degree whether or not he personally committed the burglary." The court, however, in a supplemental charge, as subsequently discussed in this opinion, gave a correct charge.

With respect to count four, a second count of conspiracy to commit burglary in the first degree, the court only briefly recapped the elements of conspiracy, relying on its earlier instruction for count two. In conclusion, it stated: "So, if you conclude with respect to count four beyond a reasonable doubt that the defendant was a member of the conspiracy and that burglary in the first degree . . . was within the scope of and in furtherance of this conspiracy, then the defendant would be guilty of conspiracy to commit burglary in the first degree whether or not he personally committed the burglary."

With respect to count six, conspiracy to commit assault in the first degree, the court properly charged the jury as to the elements of conspiracy and assault. It then, however, concluded as follows: "If you conclude beyond a reasonable doubt that the defendant was a member of the conspiracy and that assault in the first degree, as I have defined that for you, was within the scope and in furtherance of this conspiracy, then the defendant would be guilty of conspiracy to commit assault in the first degree as charged."[12]

[12] The court similarly charged the jury on the lesser included assault offenses regarding the conspiracy to commit assault charge. It instructed the jury as follows: "If you conclude beyond a reasonable doubt that he

After the jury retired to the deliberation room, the court asked both counsel whether there were any exceptions to the charge. Defense counsel requested that the court deliver a supplemental charge regarding the intent element of conspiracy. The court reinstructed the jury as follows: "The state must prove beyond a reasonable doubt the intention, the defendant's intention to commit the underlying charge, the conspiracy, as well as the charge underlying those conspiracies, such as assault in the second degree, such as burglary. Wherever you see conspiracy to do something or to commit a crime . . . the state . . . does have the burden of proving that the defendant acted with the criminal intent . . . to commit the acts that culminated or resulted in the crimes, underlying crimes being committed, and that is a burden on the state."

In the present case, the challenged language would have been appropriate if the state had charged the defendant with a substantive crime committed by his coconspirators as a result of the conspiracy and not simply with conspiracy. References to "within the scope of," "in furtherance of" and "reasonably foreseeable" are associated with *Pinkerton* liability. As noted earlier; see footnote 3; the *Pinkerton* doctrine allows the state to hold the defendant liable for substantive criminal offenses committed by a coconspirator, provided the

---

was a member of the conspiracy and that assault in the second degree . . . was within the scope and in furtherance of this conspiracy, the defendant would be guilty of conspiracy to commit assault in the second degree.

\* \* \*

"If you conclude beyond a reasonable doubt that the defendant was a member of the conspiracy and that assault in the third degree was within the scope [and] in furtherance of the conspiracy, then he would be guilty of conspiracy to commit assault in the third degree.

"If, however, you do not find all the elements of conspiracy to commit assault [in the] third degree are proven, or you do not find beyond a reasonable doubt that assault [in the] third degree was in the scope of and in furtherance of the conspiracy, he would then be not guilty of count six in the information."

offense was within the scope of the conspiracy, in furtherance thereof and reasonably foreseeable as a necessary and natural consequence of the conspiracy. The state did not charge the defendant, however, with a substantive offense, and, therefore, those portions of the charge that indicate that *Pinkerton* liability was sufficient to find the defendant guilty of the crime of conspiracy were improper. As noted in our discussion of the standard of review, our analysis does not end once error in the charge has been discovered. We must next determine whether the charge as a whole, including the correct language in the initial charge and the proper supplemental charge, provided the jury with enough guidance on the charge of conspiracy so as not to mislead it.

This court recently examined a similar issue in *State* v. *Rodriguez*, 63 Conn. App. 529, 777 A.2d 704, cert. denied, 256 Conn. 936, 776 A.2d 1151 (2001). In that case, the state charged the defendant with murder. During its charge, the court improperly referred to intent to engage in proscribed conduct twice within the same sentence. "The instruction, however, properly referred to the intent to cause a result, death, on five occasions, twice when reading the statutory definition of [General Statutes] § 53a-54a (a) and three additional times as a prerequisite to finding the defendant guilty of the crime charged." *State* v. *Rodriguez*, supra, 535. The court in *Rodriguez* therefore determined that the charge did not mislead the jury.

*Rodriguez* distinguishes *State* v. *DeBarros*, 58 Conn. App. 673, 755 A.2d 303, cert. denied, 254 Conn. 931, 761 A.2d 756 (2000), in which this court reversed the defendant's murder conviction on the basis of an improper jury instruction. In *DeBarros*, the court read the entire statutory definition of intent to the jury, including an improper reference to intent to engage in proscribed conduct. This court determined that "[i]t is reasonably possible that the jury was misled because the probable

effect of the improper charge was that it guided the jury to an incorrect verdict. The trial court not only improperly read the intent to 'engage in conduct' language in its initial and *two supplemental charges*, it also improperly referred back to that language seven times throughout its instructions to the jury. Under these circumstances, it does not strain reason to believe that the jury could have understood that the state needed to prove beyond a reasonable doubt only that the defendant intended to engage in the conduct of firing a gun, rather than prove on the charges of murder and attempt to commit murder that he intended to cause the death of the victim and [the victim's friend], and on the charge of assault in the first degree with a firearm that he intended to injure [the victim's friend] seriously." (Emphasis added.) Id., 682–83. In *DeBarros*, "the trial court's improper instructions were too numerous to be rectified by the court's proper instructions. In total, the court either read or referred back to the improper instruction ten times." Id., 683.

We conclude that the improper instruction in this case is more analogous to that of *Rodriguez* than *DeBarros*. Although the court in the present case repeated the improper language more times than the court did in *Rodriguez*, the court correctly issued a proper supplemental charge, unlike the court in *DeBarros*. The supplemental charge properly identified the elements of conspiracy and reminded the jurors that they needed to find that the state had proved beyond a reasonable doubt that the defendant intended both the conspiracy and the underlying offenses of burglary and assault.

The judgment is reversed in part and the case is remanded with direction to combine the two conspiracy convictions and to vacate the sentence on the conspiracy to commit assault charge. The judgment is not otherwise modified.

In this opinion the other judges concurred.